*1302 OPINION.
ÁRUndell:
The evidence presented in this case indicates that at March 1, 1913, the Parker Bun Tract of the petitioner was unique in so far as operations in the Sewickley Seam of coal were concerned. It was the only property which had been operated on a commercial scale in this seam prior to 1913, so that at the date when the petitioner acquired the propertjr the character of the coal within the property, the working conditions of the mine, and the operating costs were ascertainable. It was further unique in the fact that it was adjacent to two different lines of railroad which was of material’ advantage in that the petitioner was enabled to have a supply of railroad cars at all times sufficient to meet its demands, whereas properties located upon but one railroad in 1913 often suffered from the serious lack of railroad cars to get its product to the market.
*1303 The respondent has endeavored to have used as comparable the prices paid for properties in this district, subsequent to 1913, and has shown that there was a steady increase in prices subsequent to 1913. He, therefore, argues that the prices received in 1916 and 1917 for Sewickley coal lands would be indicative of the value of petitioner’s property in 1913. However, it seems to us he has failed to show that the properties were comparable. In the first place none of the properties, the sales of which were submitted by the respondent, were shown to have been adjacent to two railroad lines. This advantage of the petitioner’s property was shown by the petitioner to have added considerable value to its land. Second, the petitioner has shown that its property could be operated at a saving of 10 cents per ton in the cost over the average property in the district. The respondent has not shown that such advantage existed in any of the properties sold subsequently. Therefore, no direct comparison can be made between the Parker Run Tract of the petitioner and sales of other Sewickley properties. The petitioner presented several expert witnesses who had knowledge of the Parker Run Tract in 1913, who expressed the opinion that the property was worth from $400 an acre to $500 an acre. As opposed to this testimony the respondent presented only one witness who appeared sufficiently well acquainted with the situation and operation of the property in 1913 to express an opinion. This witness was of the opinion that the Parker Run Tract could not be operated as cheaply as the average of the Pittsburgh Seam properties in the district. We believe that the petitioner has proved that such is not the case and that on the contrary there was an advantage of 10 cents a ton in the Parker Run Tract over the average operations brother tracts. Since this is true there would have to be added to the value assigned by the respondent’s witness an amount representing this saving per ton. If this were done the result would not be far from $400 an acre.
It is also indicated by the 60-day letter attached to the petition that the Commissioner arrived at a value of approximately $484,000 for the Parker Run Tract coal based upon 12,000,000 tons reserve. The petitioner has proved that there were at least 13,500,000 tons in the property. This difference would have added materially to the value of the property, and on the basis of the same value per ton determined by the Commissioner would have resulted in a value of approximately $545,000.
With all these points in view we are of the opinion that the value of the Parker Run Tract of coal acquired by the petitioner in 1913 was $400 per acre on that date, or a total value of $600,000. Adjustment should be made by the respondent to invested capital and *1304 to the depletion by substituting this value for the one previously used.
The situation in respect to the Billingslea Tract is not the same as that of the Parker Run Tract. The petitioner has not shown that the Billingslea Tract has any advantages over some of the tracts which the Commissioner has submitted for comparison. It has further been pointed out in the findings of fact that the persistency of the coal seam in this tract was uncertain, and there was a possibility that the southern portion of the tract did not contain a workable deposit. The. evidence presented by the petitioner and by the respondent is in our opinion insufficient to warrant changing the determination of the Commissioner that the tract was worth $100 an acre in 1913 when acquired by the petitioner. No evidence was submitted by either party as to the value at March 1,1918, or the cost applicable to the particular portions of this tract sold in 1917 and 1918. The Commissioner’ determined a cost of $209.45 an acre in computing the profits on the sales. Although the Commissioner presented a plausible explanation of the establishment of this figure, and alleged error on his part in the determination thereof, he offered no proof as to a different value for the particular areas sold. Since it is evident that portions of this tract were more valuable than other portions, the average value per acre of the entire tract does not necessarily apply to the areas sold. We, therefore, have no justifiable basis for holding that the cost of these particular portions sold in 1917 and 1918 was other than $209.45 an acre.
The only evidence submitted as to the value of surface land was the opinion of one witness who was an officer of the company. While it is true that no evidence was submitted by the respondent on this issue, we do not feel that the unsupported opinion of an officer of the company who was not shown to have been especially familiar with the value of surface lands warrants us in finding that the Commissioner erred in determining a value of $63.07 an acre for surface land.
The petitioner paid dividends and purchased some of its capital stock in the year 1917, and claims that all of such payments should be treated as having been made from current earnings to the extent of such earnings, and that such earnings should not be reduced by a tentative tax for the year 1917.
This Board has frequently held that net income should not be reduced by a so-called tentative tax for the purpose of determining the earnings available for distribution. See L. S. Ayers & Co., 1 B. T. A. 1135. Having eliminated this issue we are then confronted *1305 with the problem of whether purchases of a corporation’s own stock would be treated in the same manner as dividends paid by such corporation. The pure' -es by the petitioner of its own capital stock did not constitute a distribution of its earnings, but merely served to reduce the amount of capital embarked in the business. Such purchases did not affect the current earnings of the year and the surplus outstanding at the beginning of the year was also unchanged. The only source from which the payment could have been made was from the capital originally paid in for stock. We, therefore, hold that in so far as the purchases of the petitioner’s own stock are concerned, such purchases were made from capital and the invested capital should be reduced at the beginning of the year by prorating each purchase from the date thereof to the end of the year. To hold otherwise would be to permit a portion of the surplus earned during the year to be included in the computation of invested capital for the year, which is contrary to the provisions of section 207 (a) (3) of the Revenue Act of 1917. This decision is substantially in accord with the holding of the Board in Simmons & Hammond Manufacturing Co., 1 B. T. A. 803; Hutchins Lumber & Storage Co., 4 B. T. A. 705; and Clearfield Lumber Co., 3 B. T. A. 1282. No error has been shown in the Commissioner’s adjustment of surplus incident to the payment of dividends, except that the taxable net income available for dividends should not be reduced by a tentative income and excess-profits tax for the year 1917, and except that the amounts paid for capital stock should also be eliminated from this computation.
On October 15, 1918, the petitioner sold $40,000 par value of its preferred stock, but the respondent failed to include in invested capital any amount on account of this sale. The respondent ha» admitted error in respect to this omission and has agreed that the sum of $8,547.95 should have been included in invested capital on account thereof. This transaction is just the reverse of the transaction set forth in the preceding issue and is consistent therewith.
The question of special assessment is dependent upon whether or not abnormalties exist, as prescribed by such relief sections, after the accounts had been adjusted in accordance with the decision of the Board on the various other issues presented. It is, therefore, held that the petitioner may have a further opportunity to show cause for the application of the relief sections after the computation of the deficiency has been determined under Rule 62(a).

Judgment will be entered umder Rule 50.